IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARIE JUSTEEN MANCHA
through her Next Friend Maria
Christina Martinez, et al.,

   Plaintiffs,

    v.

IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

   Defendants.

CIVIL ACTION FILE
NO. 1:06-CV-2650-TWT

ORDER

This is a civil rights class action. It is before the Court on the Defendant Gregory L. Wiest's Motion for Summary Judgment on Count VI of the Plaintiffs' First Amended Complaint - Class Action [Doc. 53]. For reasons stated below, the motion is GRANTED.

I. BACKGROUND

This action arises out of a series of raids conducted by federal immigration authorities. In September 2006, the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), conducted an immigration

enforcement operation. As a result, the Plaintiffs brought suit against the Defendants, in their individual and official capacities, alleging that the Plaintiffs were racially profiled, harassed, and discriminated against in violation of the Fourth and Fifth Amendments to the U.S. Constitution. Because there are numerous Plaintiffs and Defendants, this background discussion will be confined to the parties at issue in this motion for summary judgment.

The Plaintiff Maria Margarita Morales is a Latina woman, and a natural born United States citizen. She lives with her mother and her three children in Oak Park, Emanuel County, Georgia. She works as an administrator at the Crider poultry plant in Stillmore, Georgia. On September 1, 2006, she was driving home from work. She made a quick stop at the post office in Stillmore, and from there, continued driving home in her Jeep. Because it was a hot day, and her air conditioning was broken, she drove home with her window rolled down. Just as she was about to turn right onto Old Kenfield Road, she stopped. She waited as a long line of cars turned onto the same road. As soon as they passed, Morales turned onto the road, and drove immediately behind the long line of cars. Suddenly, an unmarked car driven by an unidentified individual pulled over to the left side of the road, allowing Morales to pass him. As soon as she passed him, he pulled his car directly behind her. Thus, she ended up among the cars in an ICE caravan.

Soon after, all of the cars in the caravan stopped in the middle of the two-lane road. As Morales was coming to a stop, the car in front of her, and the car immediately behind her, turned on blue lights. She contends that the car behind her stopped so closely that she was "boxed in," and unable to drive away. In her affidavit, Morales indicates that she interpreted this as a signal for her to stop. Two agents emerged from the vehicles. They walked up to the side of Morales's vehicle, and began to ask her questions. They did not identify themselves. The Plaintiff also indicates that they asked questions "angrily." She alleges that the agent in the car behind her repeatedly called her a "Mexican," and demanded that she get out of her Jeep. She insisted that she was a U.S. citizen, and that she was born in Texas. She produced a Georgia driver's license. According to the Plaintiff, the agent called the license "fake," and again demanded that Morales get out of her Jeep. She stayed in the car.

Morales contends that she was stopped for fifteen to twenty minutes before she was allowed to leave. She was told to take another route to her home. The officers instructed her to wait until the agents had "finished their business and returned to Stillmore." (Pl.s' Resp. to Def.'s Mot. for Summ. J., Ex. 1, at 3). In addition, she says that one of the officers told her not to make any phone calls or to tell anyone that "immigration" was in town.

The Plaintiff is unclear which agent is Defendant Wiest. Neither agent identified himself, and because of the stay on discovery, the Plaintiffs have been unable to figure out who is who. There is some evidence, however, that one of the agents was acting at the behest of the other. Morales contends that the agent from the car in front of her kept whispering things into the ear of the other agent. This happened so frequently that the Plaintiff believes that one agent was taking orders from the other.

The Defendants' version of events is quite different. Wiest identifies the two agents as himself and Agent Robert Rodriguez of ICE's Atlanta Office. Wiest and Rodriguez were driving in a caravan of ICE vehicles when they encountered Morales. Based on a tip from a confidential informant, the caravan was on its way to the residence of a number of suspected illegal immigrants. The confidential informant was traveling in the first car, Wiest in the second to last car, and Rodriguez in the last car. The Defendants contend that the caravan continued driving in this manner for a few miles. Once Morales's vehicle got caught up in the caravan, the lead vehicle stopped. All of the vehicles, including Morales's Jeep, then stopped in the right lane of the road. The two agents got out of their cars. Rodriguez denies yelling at Morales or calling her "Mexican." Both agents deny that Morales was "boxed" in, and maintain that the encounter lasted no more than four or five minutes. They also claim

to have identified themselves. Rodriguez admits that he asked Morales for her identification, and that he asked her where she was born. He further admits that they asked her to avoid using her cellular phone so as not to disrupt the law enforcement operation. He says that she was "agreeable" to these "requests."

The Defendant's motion seeks summary judgment as to Count VI of the Plaintiffs' First Amended Complaint. Count VI is a claim by Morales against Wiest and John Doe. Morales alleges that the Defendants violated her Fourth Amendment rights and her Fifth Amendment right to equal protection. She seeks compensatory and punitive damages for outrage, humiliation, and emotional distress. The Defendant asserts qualified immunity as to her claims.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

### III.  DISCUSSION

The Plaintiffs have brought their constitutional claims under authority of the Supreme Court's decision in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  They allege that the Defendants' conduct violated Morales's Fourth Amendment right to be free from unreasonable seizures and her Fifth Amendment right to equal protection.

Wiest seeks summary judgment on his behalf with respect to his defense of qualified immunity.  Even if Wiest acted unconstitutionally, he may be shielded from liability for civil damages if he did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity protects government officials from suits in their individual capacities so long as they were performing discretionary functions. McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).  Determining whether an official is entitled to qualified immunity requires asking two questions.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  First, viewing the facts in the light most favorable

to the party asserting the injury, do the facts show that the official's conduct violated a constitutional right?  Second, was the right clearly established?  Id.

The Supreme Court has explained that the key question for the purposes of determining whether a right was "clearly established" is whether the state of the law at the time of the violation gave the officials fair warning that their alleged conduct was unconstitutional.  Hope, 536 U.S. at 741.  "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them."  Holloman v. Harland, 370 F.3d 1252 (2004) ("This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations.").

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  It protects the rights of citizens who may be mistaken for aliens, notwithstanding Congress's plenary power over immigration.  United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).

The first issue is whether the agents unreasonably seized Morales within the meaning of the Fourth Amendment.  The Defendants deny that a seizure took place at all.  It was, in their view, a brief consensual questioning.  See INS v. Delgado, 466

U.S. 210 (1984). A seizure takes place when an official "accosts an individual and restrains his freedom to walk away," United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003), or if in light of the circumstances, "a reasonable person would have believed that [she] was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). See also United States v. Cortez, 449 U.S. 411, 417 (1981) (noting that stops of persons in cars are seizures); Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

Viewing the facts in the light most favorable to the Plaintiff, Morales was seized. A reasonable person in these circumstances would not have felt free to leave. A caravan of official vehicles stopped their cars abruptly while Morales's car was sandwiched between the last two. She obviously had to stop. It is no small addition of fact to note that federal agents emerged from cars flashing blue lights. Only the most brazen and audacious driver could have believed that he was free to leave a circumstance like this. See Berkemer v. McCarty, 468 U.S. 420, 436 (1984) (stating that in most states it is a crime to ignore a law enforcement official's signal to stop, or "once having stopped, to drive away without permission"). The agents seized Morales. The question then is whether this seizure was unreasonable.

In order to determine whether a seizure was unreasonable, courts ask whether the officer's action was justified at its inception. Terry v. Ohio, 392 U.S. 1, 21 (1968). The answer to this question turns on whether the officers had reasonable suspicion to make the stop. United States v. Acosta, 363 F.3d 1141, 1144 (2004). The government must point to specific, objective, and articulable facts that reasonably warrant the intrusion. Brown v. Texas, 443 U.S. 47, 51 (1979).

I start, first, with the government's justification for the intrusion. See Terry, 392 U.S. at 20-21 ("[I]t is necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen, for there is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails.") (citations omitted). At the time of the encounter with Morales, federal agents were in the midst of conducting a sensitive law enforcement operation. The sensitivity of the operation was heightened by the presence of a confidential informant in the lead car of the caravan. It is undisputed that Morales got mixed up in the caravan. Based on her presence in the caravan, they had legitimate grounds to conduct a brief investigation as to whether her presence was intentional or accidental. If she was there by mistake, the government had an interest in stopping her in order to request that she take an alternate route and to ask her to avoid notifying anyone in

town that federal officials were on their way. Indeed, this is what happened. It goes almost without saying that the government has a strong interest in protecting the safety of its officers. If suspected criminals are tipped off that the authorities are on the way, government officials are at a heightened risk of being injured or killed while attempting to do their jobs.

Whether the detention lasted only five minutes, as the Defendants contend, or twenty minutes, as Morales contends, it was brief. See United States v. Place, 462 U.S. 696, 710 (1983) ("[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."). The officers did not brandish weapons. They did not remove Morales from her car. They did not search her or her car. While any encounter with a law enforcement official may be startling to the average citizen, this encounter appears to have been minimally intrusive. Morales was briefly questioned, and then asked to take an alternate route home.

In my view, the brief stop and subsequent questioning of Morales, in the context of the immediate law enforcement needs of the ICE officials, did not constitute an unreasonable seizure. Looking at the totality of the circumstances, the agents took a series of legitimate and measured responses in order to protect a

sensitive law enforcement operation. See United States v. Sokolow, 490 U.S. 1, 8 (1989) ("In evaluating the validity of a stop such as this, we must consider the totality of the circumstances - the whole picture.") (citations omitted). Morales concedes that she found herself inside a caravan of Immigration and Custom Enforcement vehicles. Once the caravan stopped, she had a brief encounter with law enforcement officials that lasted at most up to twenty minutes. She was asked to identify herself, and then received specific instructions from law enforcement officials that were designed to protect the operation. Terry, 392 U.S. 1, at 18 ("In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness.").

This would be an easy case except for one wrinkle: the ICE agents did not suspect that Morales had violated any *criminal law*. Most courts, in recounting the standard for what constitutes a legitimate Terry stop emphasize the fact that the government official must be motivated by a reasonable suspicion that an individual is engaged in *"criminal activity."* See, e.g., United States v. Arvizu, 534 U.S. 266, 273 (2002) (noting that investigatory stops that "fall short of traditional arrest" satisfies the Fourth Amendment where "the officer's action is supported by reasonable suspicion that *criminal activity* may be afoot"); United States v. Powell, 222 F.3d 913,

917 (11th Cir. 2000) ("Under Terry, law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, *criminal activity*.") (emphasis added); Acosta, 363 F.3d at 1145 (recounting that an assessment of whether a Terry stop is justified turns on whether the officials suspected that an individual "had engaged, or was about to engage, in a *crime*"); United States v. Espinoza, 433 F. Supp. 2d 186, 190 (D. Mass. 2006) (citing Terry, 392 U.S. at 27).

      The Plaintiffs contend, rightly, that Morales did nothing wrong. She broke no laws. And neither did the agents suspect that she was engaged in criminal activity. The Defendants do not argue at any point in their briefs that they suspected that Morales had done anything illegal. After all, she was driving on a long stretch of public road. The Plaintiffs contend that without some allegation that Morales was suspected to have engaged in criminal wrongdoing, there is no legitimate basis for stopping her. Without such individualized suspicion, they argue, "the balance between the public interest and [Morales's] right to personal security and privacy tilts in favor of freedom from police interference." Brown v. Texas, 443 U.S. 47, 52 (1979). See also Chandler v. Miller, 520 U.S. 305, 308 (1997) ("The Fourth Amendment . . . restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion."); City of

Indianapolis v. Edmond, 531 U.S. 32, 48 (2000) (requiring individualized suspicion of a crime rather than general interest in crime control as a legitimate basis for a stop).

The Defendant cites Terry v. Ohio, 392 U.S. 1, 21 (1968), and INS v. Delgado, 466 U.S. 210 (1984), to argue that a "Fourth Amendment seizure is justified where specific and articulable facts, taken together with rational inferences from those facts, warrant the intrusion caused by the seizure." (Def.'s Mot. for Summ. J., at 18.) As an initial matter, Delgado does not provide authority for the stop. There, the Court held that the questioning of an entire workforce by Immigration and Naturalization Service officials did not amount to a seizure. The Court never addressed the question of what constituted a reasonable basis for detention. Delgado, 466 U.S. at 219. ("Under our analysis, however, since there was no seizure of the work forces by virtue of the method of conducting the factory surveys, the only way the issue of individual questioning could be presented would be if one of the named respondents had in fact been seized or detained. Reviewing the deposition testimony of respondents, we conclude that none were.")

In my view, Terry does not provide explicit support for the view that the government may stop people in order to protect the success of an ongoing criminal operation. After all, Terry addressed the question of when an officer could constitutionally stop an individual that was suspected of engaging in *criminal activity*.

But nothing about <u>Terry</u>'s central holding conclusively prohibits the ICE agents' actions. <u>Terry</u> is silent on the question of whether an official may constitutionally seize a citizen in order to investigate whether her presence may disrupt an ongoing law enforcement operation even though the individual is not suspected of engaging in any criminal wrongdoing. Justice Warren's central concern in <u>Terry</u>, however, was the reasonableness of official action determined by comparing the government's specific interests to the individual's interest. <u>Terry</u>, 392 U.S. at 20-21.

Based on the specific facts before me, the agents acted reasonably and within the bounds of the Fourth Amendment. A court may well reach another conclusion, however, if it were determined that immigration authorities used the cover of a "sensitive law enforcement operation" as a way to evade the Supreme Court's decision in <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 884 (1975). In <u>Brignoni-Ponce</u>, Justice Powell made clear that "[f]or the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less that a reasonable suspicion that they may be aliens." <u>Id.</u> Nothing about my decision today should reflect the view that immigration officials are authorized to stop and interrogate drivers on the road simply because they happen to be driving near a caravan of immigration officials. Here, based on these

specific facts, there was an objective basis for a brief and limited stop. The officers are entitled to qualified immunity. Their actions did not violate the Fourth Amendment, let alone clearly established law, as they had "arguable reasonable suspicion" to conduct a limited stop. See Jackson v. Sauls, 206 F.3d 1156, 1165-66 (11th Cir. 2000). There was no obvious and flagrant violation of Morales's Fourth Amendment rights. The Defendant should prevail on his claim of qualified immunity.

Morales also contends that she was racially profiled by government officials in violation of her Fifth Amendment right to equal protection. The Due Process Clause of the Fifth Amendment contains an equal protection safeguard. See Bolling v. Sharpe, 347 U.S. 497, 499-500 (1954). The individual's right to be free from such government sanctioned discrimination has been clearly established for over a century. See Yick Wo v. Hopkins, 118 U.S. 356 (1886); see also Swint v. City of Wadley, 51 F.3d 988, 992 (11th Cir. 1995) (describing the right to be free from "intentional racial discrimination in law enforcement" is clearly established). The Plaintiff has failed to put forth evidence creating a genuine issue of triable fact as to whether Wiest racially profiled Morales. There is no evidence in the record the Defendants were aware of Morales's race when they stopped her, or that they were motivated by a racially discriminatory purpose. Although the Court acknowledges that "the Constitution prohibits selective enforcement of the law based on considerations such as race,"

Whren, 517 U.S. at 813, the Plaintiffs have not provided the Court with any evidence that the Defendant's actions were driven by such a purpose. Again, it is undisputed that Morales's vehicle got caught up in the caravan of law enforcement vehicles. The Plaintiffs have put forth no evidence that a racially discriminatory purpose, as opposed to an impulse to investigate why Morales's vehicle was in the caravan, motivated either one of the officers. The agents are entitled to qualified immunity because there has been no showing of a violation of Morales's constitutional rights.

## IV. CONCLUSION

For the reasons stated above, the Defendant Gregory L. Wiest's Motion for Summary Judgment on Count VI of the Plaintiffs' First Amended Complaint - Class Action [Doc. 53] is GRANTED.

SO ORDERED, this 23 day of October, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge