Wiest 5-13-08 ascii.txt

17      that question.

18              THE WITNESS:  Mr. Muller resides in

19      Savannah.

20      Q.      (By Ms. Bauer)  And you did not speak

21 with him --

22      A.      No, ma'am.

23      Q.      -- in preparation for this?  Okay.

24 What was his role in September of 2006?

25      A.      He was one of the agents assigned to

13

1 the office in Savannah who participated in the

2 enforcement action.

3      Q.      Okay.  Now, I will want to go through

4 sort of the role that each of these individuals played

5 in the enforcement actions, but first I would like to

6 go through the planning for the enforcement action in

7 and around Stillmore, Georgia.  Who was involved in

8 planning those enforcement actions?

9      A.      Okay.  The planning of the enforcement

10 action was a number of people.  Julie Myers was the

11 assistant secretary for ICE; Marcie Forman,

12 F-o-r-m-a-n, who was the director of investigations;

13 John Clark, he was the assistant secretary -- the

14 deputy assistant secretary, I apologize -- Gary Lang,

15 L-a-n-g, was with congressional affairs; Matthew

16 Allen, A-1-1-e-n, he is with the work-site-enforcement

17 division in Washington, D.C.; John Shofi, S-h-o-f-i,

18 who also is in the work-site-enforcement division in

19 Washington; and Phillip Warfield, W-a-r-f-i-e-l-d,

20 again in work-site-enforcement division.

Page 11

EXHIBIT

_B_

Wiest 5-13-08 ascii.txt
21             And I have the address for all those

22   folks if you would like to have that because I think

23   you requested contact information.

24        Q.    Yes.

25        A.    That would be in ICE headquarters.  The

▯

14

1    address there is 425 I Street.

2         Q.    Eye, E-y-e?

3         A.    I, as in India.  425 I Street,

4    Washington, D.C. 20536.  And so that's all the folks

5    in Washington.

6               Kenneth Smith, he is a special agent in

7    charge, or the SAC, the acronym, of the Office of

8    Investigations in Atlanta -- Their office address is

9    1100 Centre Parkway, Atlanta, 30344 -- and myself, and

10   I can give you my address.

11        Q.    Okay.

12        A.    And that is 222 West Oglethorpe

13   O-g-l-e-t-h-o-r-p-e, Avenue, Suite 301, Savannah,

14   31401 is our ZIP code.

15        Q.    And in regards to the planning for this

16   enforcement action, what was the role of Julie Myers

17   in the planning?

18        A.    As far as I know, her role was to go

19   and conduct the enforcement actions in Stillmore,

20   Georgia, and the surrounding communities.

21        Q.    And were there documents created by

22   Ms. Myers that were sent to you-all to --

23        A.    Not that --

24        Q.    -- direct you --

25        A.    -- were sent -- Not that were sent to
                         Page 12

wiest 5-13-08 ascii.txt
3  for the hotels arranged?

4      A.      It was paid for on the government

5  credit cards by the individual agents.

6      Q.      Did all the agents stay at the same

7  hotel?

8      A.      No, ma'am.  Some stayed in Savannah.

9  Some stayed in Metter, the hotel there.

10     Q.      And what is the name of that hotel?

11     A.      The Holiday Inn Express.

12     Q.      And where did agents stay in Savannah?

13     A.      I know some stayed at the Inn at Ellis

14  Square that's on Jefferson and Bay street, and others

15  made their own reservations.

16     Q.      what was the role of Gary Lang in the

17  planning of the operation?

18     A.      He was on the original conference call

19  that we had a week prior.  It may not have even been

20  quite a week.  we did the initial Crider enforcement

21  action on Friday night, the 31st of August.  So that

22  conference call may have been the beginning of that

23  week.  But Mr. Lang was on that conference call at the

24  time, and that was the last dealing I had with

25  Mr. Lang.

▯

38

1      Q.      Did you have any understanding of what

2  his role was in the planning of the operation?

3      A.      I don't know that he had a very active

4  role.  I think he was there more from his role as

5  congressional affairs.

6              I know that Mr. Kingston's office had

7  been in contact with headquarters, ICE headquarters,

wiest 5-13-08 ascii.txt
12   There was probably 20 or more personnel in that
13   trailer park.
14                 And Etowah did bring the bus into that
15   trailer park, too, because we had a number of people
16   in custody, a number of illegal aliens in custody, and
17   they loaded them there in the trailer park and then
18   departed.
19        Q.      And which trailer park are you talking
20   about?
21        A.      The trailer park on Highway 46.
22        Q.      Did Etowah bring the bus into the other
23   trailer park?
24        A.      well, the other trailer park is not a
25   trailer park.  It's a public road.  But, no, they did

                                                      61

1   not go into that area.
2        Q.      Just for the record, you are referring
3   to some notes?
4        A.      Yes, ma'am.
5        Q.      And you are reading them?
6        A.      Yes, ma'am.
7        Q.      who prepared those notes?
8        A.      I did.
9        Q.      And when did you prepare those notes?
10        A.      Last night.
11        Q.      And what did you base those notes upon?
12        A.      Information in my files that I have
13   regarding this case.
14                 MS. BAUER:  we would want a copy of
15        those notes.  Mr. wiest has indicated --
16                 MR. LONG:  Here.
                          Page 52

Wiest 5-13-08 ascii.txt

17          MS. BAUER:  Great.

18          MR. LONG:  Can we have those marked as

19    an exhibit --

20          MS. BAUER:  Yes.

21          MR. LONG:  -- by the way?

22          MS. BAUER:  Do you have another copy

23    for the court reporter?

24          MR. LONG:  Oh, yeah, we can make

25    another copy.


                                              62

1          MS. BAUER:  Okay.  Well, we'll mark

2          this as Exhibit 2, but I'm going to hold on to

3          it for the moment.

4     Q.     (By Ms. Bauer)  So just going through

5  these notes, would it be fair to say that they track

6  the categories that have been -- that were identified

7  in Schedule B of the deposition?

8     A.     I tried to do that, yes --

9     Q.     Okay.

10    A.     -- ma'am, so I could remember the

11 names.

12    Q.     Okay.  So just looking at page 1, this

13 is all in your own handwriting?

14    A.     Yes, ma'am.

15    Q.     Okay.  Page 1 refers to planning of

16 enforcement action, and there are a number of names

17 that you have already provided; is that correct?

18    A.     Correct, that's correct.  That would be

19 the top down through myself.

20          MS. BAUER:  Can we just mark this as

Page 53

```
                             Wiest 5-13-08 ascii.txt
21          Exhibit 2.
22                   (Plaintiffs' Exhibit 2 was marked for
23          identification, attached at the end of the
24          original transcript.)
25          Q.     (By Ms. Bauer)  So the paragraph or the
```

                                                            63

```
 1  section that begins "Federal, State, Local
 2  Agencies" --
 3          A.      -- is Number 3.
 4          Q.      Okay.
 5          A.      I can answer Number 2 just because I
 6  didn't need to tell you that.  I can do that from my
 7  head.
 8          Q.      Okay.  And --
 9          A.      At least I don't think you covered that
10  really, or maybe you did and --
11          Q.      No, we have not.  We have not covered
12  that.  Who are the persons --
13          A.      That would be myself.
14          Q.      Okay.  Just for the record, let me --
15          A.      I'm sorry.
16          Q.      -- let me ask the question.  That's
17  okay.  That's --
18          A.      I apologize.
19          Q.      -- okay.  I appreciate your willingness
20  to respond.  What are the names of the people who are
21  in charge of implementing the enforcement actions at
22  Crider Poultry and the surrounding community?
23          A.      Okay.  Myself, Gregory Wiest --
24          Q.      Okay.
25          A.      -- W-i-e-s-t.  Then, obviously, I was
                                 Page 54
```

Wiest 5-13-08 ascii.txt

64

1  in charge of implementing the enforcement action

2  throughout the duration of the operation.  Also,

3  Robert Rodriguez, who, at the time, was a group

4  supervisor in Charleston but transferring to Atlanta

5  as assistant special agent in charge, that weekend

6  actually, came down on a Friday night and Saturday and

7  assisted in implementing.  But he had to go back to

8  move his family, and that was it.

9       Q.       Okay.  Moving on to the second page of

10  Exhibit 2, there are a list of -- a rather extensive

11  list of names?

12       A.       Yes, ma'am.

13       Q.       Okay.  And who are these individuals?

14       A.       Okay.  The individuals, you'll see

15  there's two categories.  There is OI, okay, which is

16  the Office of Investigations for ICE.

17       Q.       (By Ms. Bauer)  Okay.  And just for the

18  record, you're referring to the upper left-hand --

19       A.       Yes, ma'am.

20       Q.       -- category of --

21       A.       Yes, ma'am.

22       Q.       -- page 2 of Exhibit 2?

23       A.       And that runs down the whole left side

24  of the page.  And then on the bottom right is

25  continued with more agents with the Office of

65

1  Investigations.

2                 And then on the upper right-hand side

Page 55

wiest 5-13-08 ascii.txt
3   of the page it is DRO, Detention and Removal
4   Operations personnel that were assigned and did assist
5   us in that area as well.
6          Q.     Now, I realize that you have already
7   identified a fair number of these individuals but not
8   all.  And I would just like to quickly go through them
9   and identify where they are each based.
10         A.     which office?
11         Q.     Yes.
12         A.     Okay.
13         Q.     Okay.  Obviously, you have answered
14  with regard to yourself, and you have answered with
15  regard to Mr. Rodriguez.  Mr. Smith is based in
16  Atlanta?
17         A.     Yes, ma'am.
18         Q.     The next name?  I'm sorry?
19         A.     It's Blankley, Jeremy Blankley.  He is
20  in Charlotte, but at the time was in Savannah.
21         Q.     Okay.  The next name is?
22         A.     Henry Cook.
23         Q.     And where is Mr. Cook?
24         A.     Mr. Cook is in Charleston.
25         Q.     And with regard to each individual -- I

66

1   think you've been doing this -- if you can indicate
2   both where they are based now and where they were --
3          A.     Okay.
4          Q.     -- at the time, if that --
5          A.     Okay.
6          Q.     -- turns out to be different.
7          A.     Okay.  I sure can.
                          Page 56

Wiest 5-13-08 ascii.txt

8      Q.      Jeffrey Cooper?

9      A.      He's in Charleston still, then and now.

10     Q.      Is the next name Bert Crapps?

11     A.      Crapps, also goes by Talbert Crapps,

12  and at the time was in Savannah.  He is now in Dalton.

13     Q.      Okay.

14     A.      Paul Criswell, C-r-i-s-w-e-l-l.  He is

15  in the Greenville office.

16     Q.      Is that Greenville, South Carolina?

17     A.      Yes, ma'am.

18     Q.      Okay.

19     A.      And the next name is Daniel Cutts, and

20  he is in the Greenville, South Carolina, office.

21  Craig Hannah.  He at the time was in the Columbia,

22  South Carolina, office and is now retired.

23             Scot McCormack, M-c-C-o-r-m-a-c-k, he

24  is in the Savannah office.  Richard McManaway, he was

25  and is in the Savannah office.  Steve Michaels, Steve

67

1  is in the Greenville office.  Karl Muller -- Karl with

2  a K -- he was in the Savannah office and is now

3  retired.

4             Don Plybon, P-l-y-b-o-n, Don was in the

5  Charleston office and is now retired.  Kevin Polk,

6  P-o-l-k, Kevin is in the Columbia, South Carolina,

7  office.  Gregory Ricks, R-i-c-k-s, he is in the

8  Savannah office.  Bill -- or William Ross, R-o-s-s, he

9  was in the Charleston office at the time and is now an

10  instructor at the Federal Law Enforcement Training

11  Center.

Page 57

                              wiest 5-13-08 ascii.txt
    12        Q.      And where is that?

    13        A.      In Brunswick, Georgia.

    14        Q.      Okay.

    15        A.      Andrea Roubal, R-o-u-b-a-l, she is in

    16   the Greenville, South Carolina, office.  Barry Sands,

    17   S-a-n-d-s, is in the Savannah office.  And as I noted

    18   earlier, he is on a temporary detail in Vermont.  Trey

    19   Taylor -- or he also goes by Howell C. Taylor, III --

    20   and he is in the Savannah office, was then and is now.

    21        Q.      Is it fair to say that Howell C.

    22   Taylor, III, is sort of formal name --

    23        A.      Yeah.

    24        Q.      -- and Trey is his nickname?

    25        A.      Yes, ma'am.  Johnny Walton, Johnny is

                                                                68

     1   in the Savannah office.  Tom -- or Thomas West, he is

     2   in the Savannah office, then and now.  Rob Purcell,

     3   P-u-r-c-e-l-l, he is in the Charleston office.  Rachel

     4   Reidell, R-e-i-d-e-l-l, is now also an instructor at

     5   the Federal Law Enforcement Training Center in

     6   Brunswick.

     7        Q.      And was she at the time?

     8        A.      No, ma'am.  She was in Charleston at

     9   the time.  I'm sorry.  Brian Robinson, Brian is in the

    10   Charleston office and was at that time.  Mark

    11   Robinson, no relation, is -- at the time was in the

    12   Charleston Office of Investigations.  He's now in

    13   Charleston Detention and Removal Operations.

    14        Q.      And continue with operations.

    15        A.      Leo Ford, Leo is in the Atlanta office.

    16   William Ward Hunter is in the Atlanta office.  Hyg
                                  Page 58

Wiest 5-13-08 ascii.txt

17  Jeong, or Jeannie Yoo, is in the Atlanta office, was
18  then and is now.
19       Q.      And is that individual a woman or a
20  man?
21       A.      It's a woman.
22       Q.      Okay.
23       A.      Joeseph Brim, B-r-i-m, is in the
24  Charleston office.
25       Q.      Okay.  I'm sorry.  It's hard for me to

                                                    69

1  read this.  Is Joeseph spelled --
2       A.      J-o-e-s-e-p-h.  I know.  It's hard to
3  read my own writing I have to admit.
4       Q.      Okay.
5       A.      William Wooten, W-o-o-t-e-n, he is in a
6  Charleston office.  Scott Ward, W-a-r-d, at the time,
7  Scott was in the office here in Atlanta with
8  investigations and is now at the academy as an
9  instructor with detention and removal.
10      Q.      Okay.
11      A.      And going to the upper right-hand side,
12  Detention and Removal Operations, Larry Orton is in
13  Atlanta.  Mark Stressinger, S-t-r-e-s-s-i-n-g-e-r,
14  he's in Atlanta.  Phillip Scott at the time was in
15  Atlanta, and I believe he's still there.
16              Michael Nelson, the same, in Atlanta.
17  Evan Katz, K-a-t-z, is in Atlanta.  I believe he still
18  is.  Charles Hicks, H-i-c-k-s, Charles is in Atlanta.
19  Rob, or could be Robert, James, he was in Atlanta at
20  the time.  He is now in the Stewart facility down in

                          Page 59

                        wiest 5-13-08 ascii.txt
21  Lumpkin county, Georgia.

22      Q.      And is he still employed by ICE?

23      A.      By DRO, yes, ma'am.

24      Q.      Okay.

25      A.      which is ICE.  You're right.  I'm

                                                        70

1   sorry.

2       Q.      That's okay.

3       A.      John vanek, V-a-n-e-k, was in Atlanta

4   DRO at the time and is now employed by ICE DRO at the

5   Stewart facility.  And David casimiro,

6   C-a-s-i-m-i-r-o, at the time was with Detention and

7   Removal in Atlanta and is now with Detention and

8   Removal at the Stewart facility as well.

9       Q.      Thank you.

10      A.      Yes, ma'am.

11      Q.      Moving on to the third page of Exhibit

12  2, which does not have a Number 3 on it but which is

13  the third page --

14      A.      Okay.

15      Q.      -- of the document, can you tell me

16  what the sort of first category of --

17      A.      Yes, ma'am.  On the 30(b)(6) notice, we

18  talked about, I believe it was Number 6, training

19  manuals, that type of information.  So that's why I

20  documented the old INS handbook, Chapter 5.1 on search

21  and seizure, as well as the old Chapter 4.9, on what

22  they qualify as -- or note as area control

23  investigations.

24              That is, as you know, very outdated,

25  but that was the standard if you -- As the example,
                        Page 60

wiest 5-13-08 ascii.txt

71

1   agents in my office that have been around for 12, 15
2   years, they came up with INS training because that was
3   their background, whereas I have agents in my office
4   and myself that came up on the customs side.  So I
5   would have received my training from the custom
6   service and legal counsel, and they would have
7   utilized the customs services handbook, Chapter 42,
8   for search and seizure.
9              Then as we noted -- or as I noted
10  earlier, the ICE special agent handbook now kind of
11  encompasses all of that now that we're one agency.
12  And Chapter 42 covers search and seizure, consent
13  searches, and then the operational plans, which we
14  spoke about.
15      Q.      And those would be, as far as you know,
16  the only documents that directed the activities of the
17  enforcement agents?
18      A.      Right.  Yes, ma'am.
19      Q.      Okay.  The next line says "Bronco
20  Drive."
21      A.      Yes, ma'am.
22      Q.      Is that in response to category --
23  Topic Number 8?
24      A.      Yes, ma'am.
25      Q.      -- with regard to Ms. Mancha and Ms.

72

1   Martinez?
2       A.      Yes, ma'am.

Page 61

Wiest 5-13-08 ascii.txt

3      Q.     Okay.  And can you tell me what your
4  notes say here.
5      A.     That was identifying who was located
6  outside of the residence of Bronco Drive, which I
7  believe is in Reidsville, Georgia.
8      Q.     Okay.  And just because I can't always
9  read other people's handwriting, what do these
10  actually say?
11     A.     Okay.  Outside SAs, for special agents,
12  Ford, Hunter, McCormack, Muller, Plybon, Ricks, and
13  Special Agent Yoo.
14     Q.     And do you have information with regard
15  to how many of these seven individuals entered the
16  home at --
17     A.     None entered the home.
18     Q.     And what is your information based
19  upon?
20     A.     Upon statements of the agents who were
21  there.
22     Q.     And how was it determined -- who
23  determined that agents should go to the residence on
24  Bronco Drive?
25     A.     I did.

□

73

1      Q.     And how was that determination made?
2      A.     That was made from the Immigration Form
3  I-9s that were -- somebody had documented -- somebody
4  who had a false I-9 -- or false information on an I-9
5  -- Excuse me -- false A number, social security
6  number, that worked at Crider had utilized that
7  address in Reidsville as their address.
                      Page 62

wiest 5-13-08 ascii.txt

8          Q.      And what was the purpose of visiting
9   the residence?
10         A.      To determine if that individual was at
11  that residence.
12         Q.      And it is the position of the
13  government that no one entered the premises at all?
14         A.      Correct.
15         Q.      Is it the position of the government
16  that someone knocked on the door?
17         A.      Yes.
18         Q.      Okay.  And what happened?
19         A.      Special Agent Leo Ford knocked on the
20  door, and Ms. Mancha answered the door.  Special Agent
21  Yoo observed that Ms. Mancha, being a female, was
22  there answering the door, so she walked up to the top
23  of the -- I guess there's a few steps there.
24                 And while Special Agent Ford was
25  speaking to Ms. Mancha -- so there's two agents there

74

1   speaking to Ms. Mancha, and they determined that the
2   person they were looking for was not there, and the
3   agents never went inside.
4                 Ms. Mancha was in a very engaging
5   conversation with the agents, and the agents then
6   departed.  The conversation between Special Agent Yoo,
7   Special Agent Ford, and Ms. Mancha was observed by
8   Special Agent McCormack who was in -- also in front of
9   the trailer.
10                Agents, when we went out on these --
11  into the enforcement actions into the neighborhoods,

Page 63

Wiest 5-13-08 ascii.txt

12  the agents were wearing -- they were identified as ICE

13  agents.  They have kind of our raid gear in the sense

14  where you have a bulletproof vest on standard.  It has

15  ICE on it, police on it.  They identify themselves as

16  ICE agents.  So the agents were dressed in that

17  attire.

18              Agent Muller, Agent Plybon, Agent

19  Ricks, and Agent Hunter were on perimeter security.

20  The conversation lasted only a few minutes, and then

21  they departed.

22              The agents noted that -- Agent Ricks

23  noted that when they were departing Ms. Mancha walked

24  out of the house and seemed very relaxed and was

25  walking over to a neighbor's house.  The agents never

                                                      75

1  encountered Ms. Martinez.  They believe that may have

2  been who was driving up as they departed the parking

3  area around the trailer.

4       Q.      And in order to provide this testimony

5  about these activities, did you review reports or

6  documents?

7       A.      I spoke with the agents that were at

8  the trailer.

9       Q.      Did you speak with all seven of the

10  individuals who are listed here?

11      A.      I spoke with Agent McCormack, Agent

12  Muller, Agent Ricks, Agent Yoo, Agent Ford.  I

13  probably have spoken with all seven.

14      Q.      And how recently did you speak with

15  them about this?

16              MR. LONG:  I'm sorry.  I didn't hear
                        Page 64

Wiest 5-13-08 ascii.txt

17          that.

18          Q.      (By Ms. Bauer)  How recently did you

19    speak with them about this?

20          A.      Oh, it was -- this was within a couple

21    of days after the -- after the incident.

22          Q.      In order to prepare for this

23    deposition, did you speak with them again?

24          A.      No, ma'am.

25          Q.      How were you able to provide

76

1    information about the sort of specific location of

2    each agent about an incident that occurred a year and

3    a half ago if you haven't spoken with them recently?

4          A.      Because when the newspaper articles

5    came out subsequent to the enforcement actions, the

6    agents commented that, you know, this is -- I believe

7    this is one of the allegations that was in the local

8    paper that this occurred.  And the agents said that

9    never occurred like that.

10                  I believe she made the comment, and I

11    believe the agents noted that in their -- in their

12    statements to the Department of Justice attorneys.

13    But I believe -- And I would be paraphrasing, but

14    Ms. Mancha noted that this was really cool, and she

15    heard that we had been out there in the surrounding

16    communities and couldn't wait to tell her friends at

17    school.

18          Q.      Did you take any notes of that

19    conversation?

20          A.      No, ma'am.

Page 65

Wiest 5-13-08 ascii.txt

3    Q.      Okay.  What does the entry under

4  Adrian, Georgia, say?

5    A.      Those were the personnel who were at

6  the residence in Adrian, Georgia:  Mr. Perez, and

7  that's Special Agent Blankley, and DRO personnel

8  Mr. Orton, Mr. Stressinger, Mr. Scott, Mr. Nelson,

9  Mr. Katz, and Mr. Hicks.

10    Q.      What is the basis for your knowledge

11  about who was present at the home of the Ranulfo Perez

12  on 18 Bear Road in Adrian, Georgia?

13    A.      I had sent Mr. Blankley and his team,

14  which was the DRO personnel, to find the address in

15  Adrian, Georgia, because, again, that address was

16  utilized on the Form I-9 as an address of somebody who

17  was not authorized to be working in the United States.

18    Q.      Okay.

19    A.      And I noted -- I have -- what I was

20  using to kind of guide me -- I think we kind of went

21  over this a little bit earlier.  But we had a

22  spreadsheet of -- from the I-9s where we -- we would

23  take all the names, the A number of the individual --

24  The information on the I-9, I believe, has the date of

25  birth -- the address they utilized, and then who the

                                                    80

1  preparer of the I-9 was and who is the certifier of

2  the I-9.

3              And we would utilize that spreadsheet

4  to determine where to go.  As I noted earlier in

5  response to your question, we were directed to go to

6  every address on the Form I-9s, as best we could

7  determine that they exist.

                    Page 68

Wiest 5-13-08 ascii.txt

8        Q.       And that was your directive from
9   Washington?
10       A.       Yes, ma'am.
11       Q.       Okay.
12       A.       So on the spreadsheet, like an Exel
13  spreadsheet on a legal-size paper, I was able to note
14  in -- in some instances, I've got this is who went to
15  that address because I might put the agent's initials
16  on that.  So that's why I am able to determine that
17  Special Agent Blankley went to this address.
18       Q.       Because that was marked on the
19  spreadsheet?
20       A.       Yes, ma'am.
21       Q.       Okay.  And --
22       A.       And I had some notes that would -- I
23  was working off of there, which I mentioned earlier
24  reviewing notes so....
25       Q.       Where is that spreadsheet?

                                                        81

1        A.       It's in my file.
2        Q.       And was any kind of -- you indicated
3   notes.  Were there any kind of audio or video
4   recordings of any of this?
5        A.       No, ma'am.
6        Q.       Okay.  So what was the role of -- I'm
7   sorry.  Is it --
8        A.       Blankley.
9        Q.       Blankley?
10       A.       Yes, ma'am.
11       Q.       What is the role of Agent Blankley at

Page 69

Wiest 5-13-08 ascii.txt
12  that address?

13       A.      He was acting as the team leader, if
14  you will. They found the address. They -- Again, the
15  addresses -- We went to that address based on the I-9.
16               They pulled into a driveway area and
17  got out of their vehicles. Again, they had their ICE
18  gear on to identify themselves as ICE agents, law
19  enforcement officers.

20               And they observed two individuals
21  working on a vehicle -- It may have been a truck -- a
22  vehicle in the driveway. They approached them as a --
23  The gentlemen, one of the gentlemen, went into the
24  truck and pulled out like a metal square, kind of like
25  a carpenter's square that you might use to draw

82

1  straight lines, and held it with both hands and walked
2  towards the agents.

3               At that time Agent Blankley drew his
4  weapon into a low ready position and did not point it
5  at the gentlemen. He said, "Put your hands up;
6  police." And he also said it in Spanish, at which
7  time the DRO personnel was able to go over and put his
8  hand on the gentleman, and the gentleman dropped the
9  square. Mr. Perez walked --

10       Q.      Was that gentleman Mr. Perez?

11       A.      No, it was not, ma'am.

12       Q.      Okay.

13       A.      It was a gentleman that I don't have
14  his name, but he had been issued a notice to appear on
15  a prior -- on the -- when we did the enforcement
16  actions at Crider on the night of the 31st, which led
                          Page 70

wiest 5-13-08 ascii.txt

17  over into the first, a number of individuals were

18  issued what we call a notice to appear.

19              If they're caring for a child or if it

20  was a mother with a single child or if they showed up

21  and were determined to be illegal at Crider but yet

22  they had a minor in the car, we would not take them

23  into custody.  We would issue them a notice to appear

24  before an immigration judge at a later date.

25              So that gentleman was later identified

83

1   as someone who had received a notice to appear on a

2   prior date.  Mr. Perez and Mr. Blankley walked towards

3   one another, and Mr. Perez reached behind his back.

4   And based upon that, that movement, in light of the

5   other gentleman who had grabbed the square, Mr. --

6   Agent Blankley went over and put his hands on

7   Mr. Perez and had him put his hands on the vehicle and

8   he patted him down for officer safety.  No weapons

9   were found.

10              He released him.  He asked him, "Do you

11  speak English?"  And Mr. Perez said, yes, he did.  And

12  as Mr. Blankley noted, in a southern accent he said,

13  "Yes, I do."  And Mr. Blankley released him, and they

14  had a conversation.

15              He advised him why they were there, who

16  they were looking for.  He said that that person was

17  not there.  I believe it was a female.  If I had the

18  I-9 sheet in front of me, I could tell you the name of

19  the person.  I believe it was a female.  Mr. Perez

20  noted to Mr. Blankley that that person was not there.

Page 71

Wiest 5-13-08 ascii.txt

21          Mr. Blankley -- or Agent Blankley asked

22  Mr. Perez for a consent to search, and Mr. Perez gave

23  him consent to search.  Larry Orton from DRO also

24  received consent from some other individuals at the

25  front of the house.  And the agents, while searching

84

1  the house noted -- encountered a number of individuals

2  that had received these NTAs prior, more than just the

3  other gentleman.

4          So in addition to one other individual,

5  it was Mr. Perez's mother, who is in the country

6  illegally.  Agent Blankley noted that she appeared to

7  be somewhat not in good health.  Mr. Blankley had

8  formerly been a trained EMT and apparently he asked

9  Mr. Perez, "Is she okay?"

10          And Mr. Perez noted that "This is my

11  mother.  She has terminal cancer."  And he asked Agent

12  Blankley and DRO not to take her into custody.

13          And Mr. Blankley said, "We're not going

14  to."

15          Mr. Perez noted that agents had come

16  the day before to that address, so this was the second

17  time that this had happened.  And he asked

18  Mr. Blankley, you know, "what should I do about that?"

19          And Mr. Blankley said, you know, "You

20  may consider going somewhere for a few days or a few

21  weeks, you know, until we're done with the enforcement

22  actions in the area."

23          That was certainly entirely up to

24  Mr. Perez.  And then the agents departed the

25  residence.

Wiest 5-13-08 ascii.txt

85

1          Q.      And in terms of the information that
2   you just provided, what is the basis of your
3   personal --
4          A.      That's --
5          Q.      -- knowledge about --
6          A.      That's --
7          Q.      -- that?
8          A.      -- my speaking with Mr. Blankley and
9   Mr. Blankley's notes written subsequent to this
10  incident, of which I reviewed some time ago and
11  actually in the last few days, and spoke to
12  Mr. Blankley last night and this morning.
13         Q.      And do you have a copy of those notes
14  in your file?
15         A.      I do.  Yes, ma'am.
16         Q.      Now, your notes indicate that there
17  were a number of other individual officers present.
18         A.      Right.
19         Q.      I'm just wondering if you know what
20  role those individuals played in that.
21         A.      From my conversations and from reading
22  Mr. -- Special Agent Blankley's information and my
23  conversations with him, Mr. Blankley stayed and spoke
24  with Mr. Perez at the truck -- or at the vehicle,
25  while he was speaking with Mr. Perez, while the DRO

86

1   personnel went in and searched after Mr. Perez had
2   given consent to Special Agent Blankley and the DRO

Page 73

```
                          wiest 5-13-08 ascii.txt
 3  had also received consent from the individuals in the
 4  house.
 5           Q.      And what was the role of
 6  Mr. Stressinger?
 7           A.      That would all be the same, Mr. Orton,
 8  Mr. Stressinger, Mr. Scott, Mr. Nelson, Mr. Katz, and
 9  Mr. Hicks.  I can't say for sure that -- I don't know
10  if every one of those six went inside the residence or
11  if some walked around back and some went inside.
12           Q.      To your knowledge, did only
13  Mr. Blankley take notes?
14           A.      To my knowledge, yes.
15           Q.      Does the directive to -- or do the
16  policies applicable to the agents require that consent
17  to be documented in any kind of written form?
18                MR. LONG:  Objection; falls under
19           Category 5.  We have a protective order on
20           that.
21                MS. BAUER:  Well, I mean I'm asking --
22                MR. LONG:  Unless you can show --
23           Unless you can show me how it doesn't --
24                MS. BAUER:  Well --
25                MR. LONG:  You know, because you're
```

☐

87

```
 1           asking for policy and you're asking for
 2           direction -- directives.  And I think that the
 3           question goes to the Category 5.  Now, if you
 4           can show me that it doesn't --
 5                THE WITNESS:  Number 6 says it
 6           specifically:  "The existence and location of
 7           any and all directives, training manuals,
                                   Page 74
```

Wiest 5-13-08 ascii.txt

17  cars that --

18        A.      Right.

19        Q.      -- stopped Ms. Morales?

20        A.      Right.  Those would actually be the

21  same agents that are down under the Oak Park address

22  from Espitia.  I can read them to you.  I would be

23  more than happy to.

24        Q.      Sure, but I don't think you need to do

25  that.  So you're indicating that the final group of

                                                          90

1   names that's on page 3 of Exhibit 2 --

2         A.      Right.

3         Q.      -- that says:  "Oak Park" that starts

4   "Wiest."

5         A.      Correct.

6         Q.      Actually, could you read it to me just

7   for the record because the handwriting is not always

8   clear.

9         A.      Not for me either.

10        Q.      Your handwriting is much better than

11  mine.  Let's just say that.

12        A.      That would be Special Agent Wiest,

13  Akers, Brim, Crapps, Hardin, McCormack, McManaway,

14  Plybon, Brian Robinson, Mark Robinson, Sands, Taylor,

15  West, DRO personnel James, Stressinger, Scott, Nelson,

16  Katz, Hicks, Casimero, and I believe there was one

17  Etowah County van in there that we utilized to

18  transport aliens, which was empty at the time.

19        Q.      And --

20        A.      And a number of these vehicles, there

Page 77

Wiest 5-13-08 ascii.txt
21 was more than one person in a vehicle.

22        Q.      So there are approximately 20

23 individuals that --

24        A.      Possibly so.

25        Q.      Okay.  Let me just lay --

                                                            91

1        A.      I'm sorry.

2        Q.      -- out the question --

3        A.      Yes, ma'am.  I'm sorry.

4        Q.      -- for the record.

5        A.      I'm sorry.

6        Q.      Just so that the court reporter can get

7 it all down.  There were approximately 20 individuals

8 in the group of cars that were present when

9 Ms. Morales was pulled over?

10        A.      Yes.  I believe so.  It was probably

11 about a dozen cars.  I think we had a number of agents

12 that were paired up.

13        Q.      It is the position of the government

14 that only two individuals exited their vehicles and

15 interacted with Ms. Morales?

16        A.      Yes, ma'am.

17        Q.      And how is it that you know that the

18 same individuals were involved in the stop of

19 Ms. Morales and the visit to Ms. Espitia's house?

20               MR. LONG:  Objection to the

21          characterization of the stop of Ms. Morales.

22               THE WITNESS:  Okay.  As we departed

23          Stillmore, Georgia, to go to the address, at

24          the time unknown but ultimately in Oak Park, we

25          drove down Old Kenfield Road.  And so all
                             Page 78

92

1          individuals that were driving down Old Kenfield
2          Road also went to the address in Oak Park.
3          That was the only way to get there.
4          Q.       (By Ms. Bauer) And so is it the
5      position of the government that the incidents
6      involving Ms. Morales and Ms. Espitia occurred on the
7      same day?
8          A.       Yes.
9          Q.       And do you know what that date was?
10         A.       I believe it was Saturday, September
11     1st.
12         Q.       And were the agents, the 20 agents
13     listed, physically on their way to Mrs. Espitia's
14     house when they encountered Ms. Morales?
15         A.       Unbeknownst at the time, yes.  At the
16     time, we didn't know where we were going.  We had a
17     cooperating alien in the vehicle, in the lead vehicle,
18     with two agents that was taking us to a residence
19     where he knew that a number of Crider employees like
20     himself, who are in the country illegally, were
21     living.
22               So he said, "I'll take you there."  So
23     we were en route to them.  Again, he was providing the
24     directions to Agent McCormack and Agent Taylor in the
25     lead car.  So all the cars were en route to that

93

1      location.
2          Q.       And who was in the lead car?

Page 79

Wiest 5-13-08 ascii.txt
3         A.      Agent McCormack, Agent Taylor, and a
4    cooperating alien.
5         Q.      And was this address reflected on the
6    spreadsheet?
7                 MR. LONG: Objection.
8                 THE WITNESS:  I would have to look at
9          the spreadsheet.
10                MR. LONG: Yeah.  I would object to the
11         contents of the spreadsheet.  That's another
12         document over which we're claiming privilege.
13        Q.      (By Ms. Bauer) So is it the position
14   of the government that all 20 of the individuals
15   listed under the phrase on page 3, "Oak Park," present
16   at the home of Ms. Espitia in Oak Park?
17        A.      Can I see the question, please, or
18   could you repeat the question.
19        Q.      Sure.  Sure.  Were all 20 of the
20   individuals listed here on Exhibit 2, your notes, page
21   3, under the phrase, "Oak Park?"  Were all 20 of those
22   individuals present at the home of Ms. Espitia in Oak
23   Park, Georgia?
24        A.      I believe they probably were, yes.
25   That was my reason for the notes.  Yes, ma'am.

☐

94

1         Q.      Okay.  And just to establish for the
2    record, what is the basis of your sort of information
3    and recollection about these 20 individuals being
4    present?
5         A.      It was from the agents that identified
6    themselves as being at the Oak Park address in the
7    fall of 2006.  I mean I was at that address, so I know
                          Page 80

Wiest 5-13-08 ascii.txt

 8   some of them, but I can't tell you exactly everyone
 9   who was. So it was a compilation of my knowledge of,
10   you know, who was there. And it was also those
11   individuals who had noted to the Department of Justice
12   attorneys that they were at that Oak Park address.
13        Q.     And of these 20 individuals, was
14   somebody appointed to write notes or take a report of
15   this event?
16        A.     Nobody was directed to write notes or
17   write a report, no.
18        Q.     Did anyone do that?
19        A.     Not to my knowledge, no, ma'am.
20        Q.     Okay. Of the 20 individuals who were
21   present at the residence, how many of those
22   individuals entered the residence?
23        A.     I believe there was at least four that
24   entered the residence. There certainly could have
25   been more. I know that Special Agent Sands, Special

95

 1   Agent Rodriguez, myself, and, I believe, Mr. Casimiro
 2   from Detention and Removal entered the residence.
 3              There was a number of -- when the
 4   agents arrived at the residence, there were two or
 5   three individuals who were identified as being illegal
 6   out in front of the residence, and they were taken
 7   into custody. There were, I believe, six in total
 8   illegal alien males who were at the residence. There
 9   were females that were in the country illegally.
10   There were United States citizens in there as well.
11              Some of the females were issued notices

Page 81

Wiest 5-13-08 ascii.txt

12 to appear by Special Agent Sands, who had interviewed

13 them and who determined their alienage and

14 deportability.  And we took -- we ultimately took

15 those six in custody and we took the cooperating alien

16 in custody.

17            Inside there was identification from

18 Crider Poultry and the boots that many of them wore

19 that we found at many of the places where these folks

20 lived, and the Crider -- the Crider apparel, if you

21 will, so....

22      Q.    Who were the agents involved in

23 identifying the two or three individuals that you

24 indicated were identified as illegal outside the

25 residence?

96

1      A.    I believe that would be Agent Sands,

2 Agent West, Agent McManaway, some Detention and

3 Removal personnel -- I'm not sure which ones --

4 probably Agent Crapps was there as well, agent

5 McCormack and Agent Taylor had traveled past the

6 residence when the individual said, "Okay.  This is

7 the residence where they live."  So they kept going

8 with the cooperating alien to down the road.

9      Q.    So Agents McCormack and Taylor were not

10 physically present at Ms. Espitia's address?

11      A.    They went by her address on the road

12 but did not go to her address, if that makes sense.

13      Q.    Okay.  So you have identified four

14 individuals who entered the residence?

15      A.    Right.

16      Q.    The other 14 individuals remained

Page 82

wiest 5-13-08 ascii.txt

17 outside the residence?

18    A.    And there might have been one or two
19 others there with the residents. I know that there
20 were a number of agents outside because the Detention
21 and Removal brought the van in. So we had to pat down
22 the aliens for officer safety. We needed to secure
23 them in cuffs and load them in the van, and so a lot
24 of the agents were doing that at that time.

25    Q.    And which agent or agents spoke with

97

1 Ms. Espitia directly?

2    A.    I know that -- Well, Agent Sands spoke
3 with her. I believe that Agent Rodriguez spoke with
4 her some after a few moments. I remember a female who
5 I would believe would be Ms. Espitia, but I don't
6 know. She never introduced herself as Ms. Espitia.
7 But I know that a female went and retrieved a wallet
8 and driver's license, and I believe that's probably
9 Ms. Espitia.

10    Q.    Did those communications occur in
11 English or Spanish?

12    A.    English.

13    Q.    And which agents spoke with the other
14 members of Ms. Espitia's family?

15    A.    Agent Sands spoke with -- There was a
16 number of females there sitting on the couch, and he
17 was obtaining information from them. One, I believe,
18 was a 16-year-old United States citizen. I believe he
19 was speaking with her as well.

20    Q.    Anyone aside from Agent Sands?

Page 83

wiest 5-13-08 ascii.txt
21      A.      He was -- Agent Sands was the one who
22  was doing the -- who was doing most of the
23  conversation because on those, the females that were
24  inside the residence who are identified as being in
25  the country illegally, he took information so that

98

1  they could be issued a notice to appear before an
2  immigration judge at a later date.
3                  The males were, the six males, I
4  believe, in total, were taken into custody were
5  encountered three outside and some in -- the others
6  inside and were -- were all brought outside to be put
7  into the -- into the transport van.
8      Q.      Okay.  And did agents speak with those
9  six males?
10     A.      I believe they did.  Yes.
11     Q.      Okay.  And which agents had --
12     A.      I do not--
13     Q.      -- those conversations?
14     A.      I do not know which agents had those
15  conversations.
16     Q.      And in terms of the basis for your
17  knowledge and ability to speak about this incident
18  today -- I know you were particularly present --
19     A.      Right.  Yes, ma'am.
20     Q.      -- did you also review documents in
21  preparation for this deposition today?
22     A.      I reviewed -- I reviewed the -- some of
23  the statements made by agents.  I've spoken with the
24  agents.  I've spoken with Agent Sands, Agent
25  Rodriguez, Agent West, Agent McManaway, Agent Hicks,

Wiest 5-13-08 ascii.txt

99

1 Agent Casimiro, all within the last few days in
2 preparation for this, this week.
3        Q.      And when you said you reviewed the
4 statements by agents, which statements did you review?
5        A.      The ones that were -- Those were some
6 time ago but the ones that were prepared for DOJ.
7        Q.      Okay. And by -- which agents'
8 statements did you review?
9        A.      Again, this was some time ago that I
10 reviewed those statements, but Agent Sands, I believe,
11 Agent Rodriguez, I believe. I believe that's it. And
12 again, the rest were the conversations I had with
13 agents.
14        Q.      Okay. Which agent or agents made the
15 decision to enter the residence of Ms. Espitia's
16 house?
17        A.      I believe that when -- in my
18 conversations with Agent Sands, that as they took the
19 males into custody in front of the residence that some
20 females exited, as he termed it, to kind of understand
21 what was going on. Someone is in my front yard, and I
22 want to see what's going on. And they came out.
23                And then Agent Sands stated that
24 somebody spoke with them and received consent to go
25 in. Agent Sands does not recall which agent received

100

1 consent, but he says that one of the agents, in
2 speaking with the females, received consent to go into

Page 85

Wiest 5-13-08 ascii.txt
3   the residence.

4         Q.      Okay.  So Agent Sands said that -- And
5   then a female, whose identity he does not recall, gave
6   consent to an agent whose name --

7         A.      Right.

8         Q.      -- he does --

9         A.      One of the --

10        Q.      -- not recall?

11        A.      -- females, right, who was at the --
12   inside the trailer came out and provided consent to
13   one of the agents there.

14        Q.      And to your knowledge, is the identity
15   of the individual who allegedly gave consent, is that
16   written down or documented someplace?

17        A.      No, ma'am.

18        Q.      And is the identity of the agent who
19   heard the giving of consent written down in any place?

20        A.      No, ma'am.

21        Q.      Okay.  Who was it that made the
22   decision to depart from Ms. Espitia's residence?

23        A.      I guess it would be -- Since I was in
24   charge, I guess it would be me.  We had six aliens in
25   custody, all in the country illegally.  We had

0

101

1   information from additional illegal aliens inside of
2   Ms. Espitia's residence.  And we had information so
3   that we could issue them a notice to appear at a later
4   time.  So we then departed the residence.

5         Q.      So there was essentially no one left to
6   speak with?

7         A.      Correct.

Page 86

Wiest 5-13-08 ascii.txt

8        Q.        And then did you communicate that it
9    was time to go to the other agents?
10       A.        Yes.   I mean it was just kind of known.
11   All the aliens were in the van, and we're loading up.
12   It's time to depart.
13       Q.        And in terms of documentation of this
14   incident in Oak Park, there are notices to appear?
15       A.        Yes.
16       Q.        And there are arrest documents?
17       A.        213s, I-213s.
18       Q.        Are there any other documents that
19   memorialize what happened at Ms. Espitia's home?
20       A.        Not to my knowledge, no, ma'am.
21       Q.        Now, you indicated that there was a
22   cooperating alien involved in providing information?
23       A.        Right.
24       Q.        Which agent made the determination to
25   go to the residence --

□

102

1        A.        To Oak Park?
2        Q.        To go to the residence --
3        A.        I did.
4        Q.        Let me --
5        A.        I'm sorry.
6        Q.        Let me just make --
7        A.        I apologize.
8        Q.        -- sure that I get my question out.
9    And I'll just -- Mr. Wiest, you were the individual
10   who made the decision to go to Ms. Espitia's residence
11   in Oak Park?

Page 87

wiest 5-13-08 ascii.txt
12      A.      Yes, ma'am.

13      Q.      Okay. Was anyone else from ICE
14   involved in that decision?

15      A.      I guess ultimately it was my decision.
16   The alien had indicated to agents that spoke Spanish
17   that he knew where a number of additional Crider
18   employees who were in the country illegally were
19   living, and he was willing to take us there.

20              So we -- And I don't know which agent
21   spoke with the cooperating alien to learn this
22   information. But we decided that we would go and act
23   on the information to see if it was accurate.

24              And then we drove over there and went
25   to Oak Park and there were three individuals in front,

103

1   he identified that as the location where these folks
2   live. And they were in the country illegally. And we
3   decided to go there.

4       Q.      And were you the individual who made
5   the decision about how many sort of individual agents
6   were needed to be at that residence?

7       A.      The reason we took those agents there
8   is we had -- and we had a smaller van, as I mentioned
9   earlier, with Detention and Removal. We had earlier
10   in the day arrested more than 30 aliens in and around
11   Stillmore. And they had been loaded onto one of the
12   bigger INS buses -- the old INS buses -- Excuse me --
13   DRO buses, and we had taken them to Dalton for
14   processing.

15              So we had this one individual, and we
16   had a van. So we decided that we will go by way of
                     Page 88

Wiest 5-13-08 ascii.txt
3  congressman Kingston and others, congressman Kingston
4  mostly, and a call from the senator's office.  So we
5  developed a rapport almost with Mr. Purtle, more so
6  Mr. Purtle than Mr. crider.

7                So I did call them.  And, again, I
8  don't recall who, but I was directed to call them.
9  And he was willing to do whatever.

10      Q.    okay.  And you said, "Somebody at
11  headquarters."  Are you talking about the headquarters
12  in washington?

13      A.    Yes, ma'am.

14      Q.    okay.

15      A.    Yes, ma'am.

16      Q.    And in terms of that call from somebody
17  in headquarters, did you document or take notes in any
18  way of who that individual would have been?

19      A.    I didn't.  I would believe it would
20  have been somebody in the work-site group, so, you
21  know, it would probably have been Mr. Allen,
22  Mr. Shofi, or Mr. Warfield.  And if I did take notes,
23  I don't recall.  I mean they would still be in my
24  file.  But I don't recall specifically writing that
25  down.

108

1       Q.    okay.  Let's turn to the last page.
2       A.    Yes, ma'am.
3       Q.    of Exhibit 2.  It's the fourth page.
4  There's a notation that says, "Turkey Ridge Road."
5       A.    Yes, ma'am.
6       Q.    And then there's a list of agents; is
7  that correct?

Page 92

Wiest 5-13-08 ascii.txt

8      A.      Yes, that's correct.

9      Q.      Okay.  And this is in response to Topic

10  Number 12?

11      A.      Yes, it is.

12      Q.      And can you, just for the record, read

13  the names of the agents that are listed there?

14      A.      Yes, ma'am, I sure can.  It's myself,

15  Agent Wiest; Agent Blankley; DRO personnel Mr. Orton,

16  Mr. Stressinger, Mr. Scott, Mr. Nelson, Mr. Katz, and

17  Mr. Hicks.

18      Q.      And these eight individuals were all

19  present at David Robinson's trailer park on Turkey

20  Ridge Road in Metter, Georgia, on or about the date of

21  September 7, 2006?

22      A.      On or about, right.

23      Q.      Okay.

24      A.      It could have been the 6th, I guess,

25  6th or 7th.

 

                                                    109

1      Q.      Okay.

2      A.      I would have to look at a calendar for

3  what days are what, but I'm not sure I would agree

4  that it was a trailer park.

5      Q.      Okay.  How would you characterize it?

6      A.      Turkey Ridge Road is a road.  It's a --

7  I'll characterize it as a green sign that says,

8  "Turkey Ridge Road," which would look like any other

9  sign in a residential neighborhood, though it is a

10  dirt road.

11      Q.      Okay.  Well, I don't -- I don't want to

Page 93

wiest 5-13-08 ascii.txt
12  have an argument but --
13          A.      Okay.
14          Q.      I'm happy to use the terminology but --
15          A.      All right.
16          Q.      -- I couldn't recall it.  A group of
17  trailers owned by --
18          A.      There were two trailers.  There were
19  two trailers on that road that we attempted to obtain
20  consent.
21          Q.      Okay.  And all eight individuals who
22  are listed here were present at the --
23          A.      Trailers.
24          Q.      -- two trailers?
25          A.      Yes, ma'am, because they were not that

                                                      110
1  far apart.
2          Q.      And who was in charge of that
3  operation, visiting those trailers?
4          A.      I would say me.
5          Q.      And who decided to go to those trailers
6  in the first place?
7          A.      I guess I did.  It falls on me.
8          Q.      And were you the individual who decided
9  that the eight agents would --
10          A.      -- accompany me -- or I was one --
11  seven others, right, because Mr. Blankley was -- Agent
12  Blankley was kind of working with Mr. Orton, who is a
13  supervisory Detention and Removal officer.  So they
14  kind of teamed up.  And as we noted earlier, they were
15  together in the Adrian, Georgia, address with
16  Mr. Perez, so they had worked together.
                         Page 94

wiest 5-13-08 ascii.txt

17              So I joined them to go to the Turkey
18  Ridge Road addresses.  And we went to two trailers.
19  The very fist trailer, Mr. Blankley knocked on the
20  door, and a U.S. citizen female answered.  And Mr. --
21  Agent Blankley asked for consent to search.
22              He explained he was looking for
23  unauthorized workers that may have been employed by
24  Crider.  And the female did not provide consent.  So
25  they spoke very cordially.

111

1               I think the conversation -- And I
2   learned this from my conversations with Mr. Blankley.
3   And I was there, but I didn't overhear.  But
4   subsequent to this she indicated she was not providing
5   consent because there was somebody inside that was out
6   of status or -- I don't know if she said out of status
7   or illegally but -- And Mr. Blankley indicated -- he
8   kind of surmised it was her husband.
9               And he had indicated well, you know,
10  you can contact CIS in Atlanta if you need to file
11  some type of adjustment of status.  And that was it.
12  We then --
13      Q.      Who was -- was there any other agent
14  present when this conversation occurred?
15      A.      There were agents around the -- a
16  couple of agents in the back of her trailer and the
17  next trailer and then agents in the front as well.  I
18  was positioned kind of between the two trailers.
19              The trailers were probably, not a great
20  distance, probably 50 yards a part.  So there was an
Page 95

Wiest 5-13-08 ascii.txt
21  area in between trailers.  They weren't -- They
22  weren't right on top of one another.
23      Q.      And who was present at the other
24  trailer?
25      A.      After we -- After Agent Blankley

112

1  finished his conversation with the female in the first
2  trailer, we then walked over to the second trailer.
3  And all the personnel listed were at the second
4  trailer.
5      Q.      Okay.
6      A.      Agent Katz, I believe, with DRO
7  received consent from a female.  She had a small
8  child -- I don't know if it was a male or female --
9  probably a year old or so, and there were no other
10  individuals in the trailer.
11              There was a hole in the floor in the
12  trailer that was covered up by a makeshift piece of
13  carpet or some other piece of carpet that you could
14  move.  I didn't think much of it until right after we
15  noticed the hole in the floor, moments after, one of
16  the agents heard something from underneath the
17  trailer.
18              There was skirting around the trailer,
19  and the trailers are raised off of the ground by -- I
20  don't know if it's metal supports or cinder blocks,
21  but it was a couple of steps to get up to the trailer
22  with metal screening around it.  It was not consistent
23  all the way around.
24              There were some areas where there was a
25  gap in between, and on the corners they didn't marry
                           Page 96

Wiest 5-13-08 ascii.txt

113

1  up correctly. So one of the agents was able to see
2  there, and he could see some people under the trailer.
3  So they were telling them to come out.
4       Q.      When you say, "they were telling them."
5       A.      Agent Deera (phonetic), all of us.
6  "Come on out, ICE, police."
7       Q.      And did that happen in English or
8  Spanish?
9       A.      Both.  And one of the aliens got out
10 and ran -- well, excuse me -- one of the individuals.
11 I don't know that he was an illegal alien or not
12 because he ran and outran everybody there right into
13 the briar patch with no shoes on and kept going right
14 by Agent Hicks.
15           And he noted, I couldn't catch up to
16 him, and he wasn't stopping.  The other two
17 individuals were still under the trailer, but they
18 were having a hard time getting out.
19           There was a piece of skirting, if you
20 will -- I don't know how to describe it without
21 drawing it.  But kind of the skirting below the
22 trailer is held in by a band, if you will.  If you
23 pull the band up, you can pull the skirting out.  And
24 two of the aliens came out there when we pulled that
25 back to allow them to get out.

114

1           I guess they could have gone out the --
2  The individual who ran went out the opposite side of

Page 97

wiest 5-13-08 ascii.txt
3  where I was, so I didn't see how he got out and ran
4  past some of those folks. But the others came out our
5  side and were determined to be in the country
6  illegally so then were taken into custody.
7          Q.      So is it the position of the government
8  that skirting from the trailer was broken during that
9  incident?
10         A.      There was skirting that was already
11 broken prior to us getting there. The skirting that I
12 pulled back to allow those two gentlemen to get out I
13 put back like I found it.
14         Q.      And did any agents, to your knowledge,
15 enter the trailer through the hole in the floor?
16         A.      No, ma'am.
17         Q.      Did any agents create the hole in the
18 floor?
19         A.      No, ma'am, they did not.
20         Q.      In terms of the basis for your
21 knowledge of what happened in these trailers on Turkey
22 Ridge Road, obviously you were present?
23         A.      I was present. I was in the trailer.
24 I entered the trailer. Agent Blankley entered the
25 trailer. DRO Agent Katz, I believe, entered the

0

                                                      115
1  trailer. He was the one who received consent.
2          Q.      So there were three individuals inside
3  the trailer, three ICE agents?
4          A.      Some of the others may have come in and
5  out. I mean there could have ultimately been -- I
6  don't believe that Agent Hicks ever came inside the
7  trailer.
                      Page 98

wiest 5-13-08 ascii.txt

8           I know a couple of them were on what I
9  would call the backside. Turkey Ridge Road ran east
10 and west at that point, and the trailer was on the
11 north side of that road. So the agents were then -- a
12 couple of DRO personnel were behind that, which then
13 backed up to woods.
14           MS. BAUER:  Off the record for just a
15      moment.
16           (A discussion was held off the record.)
17      Q.    (By Ms. Bauer)  And in terms of the
18 basis of your knowledge about what happened in this
19 incident, aside from your being physically present at
20 the trailers at Turkey Ridge Road, did you review
21 other documents in preparation for this deposition?
22      A.    No.
23      Q.    Were any photographs taken?
24      A.    No, ma'am, except of the aliens that
25 were taken into custody, which is part of their I-213

116

1  but not of the trailer or the skirting.
2       Q.    And were the photographs taken of those
3  aliens taken into custody, were they taken on-site at
4  the trailers at Turkey Ridge Road?
5       A.    No.  They would be taken during the
6  processing of the aliens.
7       Q.    Did you make notes of the incident?
8       A.    No, I didn't.
9       Q.    Do you know whether anyone did?
10      A.    I don't know if anyone did.  I don't
11 recall reading any of this in preparation for this.

wiest 5-13-08 ascii.txt
```
12        Q.    Do you know which individual at the
13   trailer gave consent for the search?
14        A.    The female inside with the baby.
15        Q.    Did you hear that or --
16        A.    I did not, no.
17        Q.    who told you that consent had been
18   given?
19        A.    Agent Katz.
20        Q.    And was Agent Katz the person who --
21        A.    -- received consent.
22        Q.    who made the decision that it was time
23   to depart from that trailer?
24        A.    I guess it was me.  We had two aliens
25   in custody, and we needed to transport them.  And the
```

                                                    117

```
1    female was -- And I don't recall if we obtained
2    information to mail her out what we call the notice to
3    appear.  I can check that.  But I would have go back
4    and look.  We certainly didn't take her into custody
5    because she was with one young child.
6         Q.    Continuing on with Plaintiffs'
7    Exhibit 2 on page 4, kind of the last series of
8    entries that start with the words, "Highway 46."
9         A.    Highway 46, yes, ma'am.
10        Q.    And is that in response to Topic
11   Number 13 on plaintiffs' notice of deposition?
12        A.    Yes, ma'am, it is.
13        Q.    Okay.  And can you read for the record
14   the names of the agents --
15        A.    Yes, ma'am.
16        Q.    -- listed under Highway 46 on page 4 --
```
                              Page 100

Wiest 5-13-08 ascii.txt

17      A.      Yes, ma'am.

18      Q.      -- of Plaintiffs' --

19      A.      I can.

20      Q.      -- Exhibit 2?

21      A.      It's Agents Wiest, Blankley, Cook,

22 Cooper, Crapps, Criswell, Cutts, Hannah, McCormack,

23 McManaway, Michaels, Muller, Plybon, Polk, Ricks,

24 Ross, Roubal, Sands, Taylor, Walton, West, Stressinger

25 from DRO, Scott with DRO, Nelson with DRO, Katz with

0

118

1 DRO, Mr. Hicks, Mr. Casimiro, and Mr. James, all with

2 DRO.

3               And I seem to recall, and I don't have

4 it in this note Mr. Vanek, V-a-n-e-k, may have been

5 there as well.  I just don't recall.  But I would

6 rather say he was than not, but I'll check.

7       Q.      You had written the name Orton, and

8 that's crossed out?

9       A.      Yes.  I remembered that Mr. Orton did

10 not come that day.  He was a supervisor, but so is

11 Mr. James, and Mr. James was the supervisor on that

12 day at that location.

13      Q.      And this is a fairly long list of --

14      A.      It is.

15      Q.      In fact, I count 28 individuals.

16      A.      Okay.  I will take your count.

17      Q.      Is the basis of your knowledge and your

18 recollection of the individuals who were present from

19 memory, or did you review some notes?

20      A.      Reviewed notes, reviewed from speaking

Page 101

wiest 5-13-08 ascii.txt
21  with agents that were there and DRO personnel that
22  were there.  That was basically our whole team of
23  agents out there doing the enforcement action the day
24  we went to this trailer park, which I believe was on
25  Sunday, which would be the 2nd of September.

0

119

1          Q.      And whose notes did you review, and
2   what notes did you review?
3          A.      It would be mine.
4          Q.      Your notes from your file?
5          A.      Yes, ma'am.
6          Q.      Were those paper notes or electronic
7   notes?
8          A.      It would be paper notes, also probably
9   the operational plan which would list personnel and
10  knowing where we needed to go.
11         Q.      Did you review the operational plan in
12  preparation for this deposition today?
13         A.      Not -- no, not in the last -- not --
14  not in the last few months, I have not.
15         Q.      Who was the person or who were the
16  persons who were in charge of the operation on --
17         A.      On Highway 46.
18         Q.      -- Highway 46?
19         A.      I'm sorry.  I stepped in.  I apologize.
20         Q.      That's okay.  Who were the --
21         A.      That would be me.  Yes, ma'am.
22         Q.      Were you the person who made the
23  decision to go to that trailer park?
24         A.      I did, yes, ma'am.
25         Q.      And would you characterize that as a
                                    Page 102

Wiest 5-13-08 ascii.txt

120

1 trailer park?

2    A.    I guess I would.  It was about 20 to 25

3 trailers that were all grouped in a common area,

4 although there was a common road in and out.  There

5 was a public pay phone on that property so yes.

6    Q.    Who made the decision to go to that

7 trailer park?

8    A.    I made the decision to go there.  And

9 that was based on, again, the Immigration Form I-9s

10 where aliens -- those that were identified as

11 unauthorized workers at Crider had documented their

12 home address.

13         When we received the IN-9's from

14 Crider, there was well over a hundred people that had

15 documented that address on Highway 46 in that trailer

16 park as being their residence.  So we believed, based

17 upon the IN-9 information, that most of the people who

18 worked in there were going to work at Crider Poultry

19 and were illegal -- were in the country illegally and

20 unauthorized to work and to be in the United States.

21         So we went into that trailer park for

22 that purpose.

23    Q.    You made the determination that the 28

24 or so people would go to that trailer park?

25    A.    Yes.

121

1    Q.    And did you make the determination that

2 those individuals would go to the trailer park to find

Page 103

Wiest 5-13-08 ascii.txt
3  specific individuals who had been identified?

4         A.       We were going to the trailer park to
5  conduct knock and -- you know, consent searches, knock
6  and talks, to lead to a consent search on all the
7  trailers.   That was our goal because the trailers were
8  oftentimes --

9                  On the I-9 it would list Highway 46.
10  You know, the number, I believe, was 1789 Highway 46
11  with no lot number.   So you just knew it was in that
12  location, but you didn't know where they lived within
13  that -- within that trailer park.   So then we made the
14  determination to let's go and knock on every one of
15  these doors.

16         Q.       And is that what the agents there did?
17         A.       As they went in, a lot of people who
18  were outside -- It was probably late morning -- just
19  started running.   And agents took those that were
20  running -- they chased them down, and then they would
21  determine their status in the country to deport --
22  alienation deportability.

23                  They knocked on a number of doors.   In
24  one instance, one of the agents, Greg Ricks, knocked
25  on a door, and a guy punched a hole through a window

122

1  and cut his hand to get out.   He was going to break
2  the window out.

3         Q.       And what is the basis of your knowledge
4  about that incident?

5         A.       From speaking with Agent Ricks and
6  Agent Blankley, who, once the individual did come out
7  of his own accord, he was determined to be illegal.
                                Page 104

wiest 5-13-08 ascii.txt

8    And Agent Blankley used a medical kit to go over and
9    wrap up his hand and put bandages on it.
10                   He determined, again, from his prior
11   training and experience as an EMT that it did not need
12   stitches or anything. But he received some surface
13   cuts, so he cleaned the cut and bandaged it up.
14                   we went to a number of trailers in
15   there.  I don't have the -- I don't have the exact
16   number in front of me how many illegal aliens we --
17   that were housed in that trailer park. I believe it
18   was about 20 or so.
19                   And then there were some individuals
20   that did not answer the door to their trailer, would
21   not come out. And they were left in there if that's
22   what they -- if they didn't answer the door.
23                   we know in one case Agent Casimiro,
24   myself, and Agent Hicks were at one trailer. And
25   Agent Casimiro is a Spanish speaker as well, so he was

0

123

1    talking in Spanish and English, "Open the door, ICE
2    police."
3                   And you could hear them inside, but
4    they weren't going to come out. So we left them
5    there.
6         Q.       So Agent Casimiro instructed in Spanish
7    for the individuals to open the door?
8         A.       "Police, Police, consent to open the
9    door; open the door." And they wouldn't, you know, so
10   we departed.
11        Q.       And in terms of your basis for

Page 105

Wiest 5-13-08 ascii.txt
12  knowledge about these specific incidents, I understand
13  that you were present at the trailer park?
14       A.    Yes.
15       Q.    Did you review other documents or have
16  conversations in anticipation of this deposition?
17       A.    I did.
18       Q.    What did you do?
19       A.    I spoke with Agent Blankley.  I spoke
20  with Agent Casimiro, Agent Hicks.  I spoke with -- not
21  just prior to this deposition but during the past when
22  this happened 20 months ago or so, I spoke with agents
23  in my office about it.
24             That would be Agents McCormack, Agent
25  Taylor, Agent West, Agent McManaway.  Detention and

0

                                                      124

1  removal, as I mentioned, Mr. Casimiro, I spoke to him.
2  We just actually spoke yesterday about this by
3  telephone.  And Mr. Hicks I spoke to yesterday, and,
4  as you know, to my knowledge from being there.
5       Q.    And did you review documents related to
6  the incident at --
7       A.    I did.  I reviewed -- I reviewed the --
8  my spreadsheet document, the I-9 information, to
9  determine how many -- how many times that address was
10  utilized by these -- by those individuals that were
11  deemed to be unauthorized workers at Crider.  I
12  reviewed that.  Gosh, that's probably about it.
13             MS. BAUER:  I think this would be a
14         good time to take a break.
15             (Lunch recess taken, 12:11 p.m. to
16         1:00 p.m.)
                Page 106